up here. So that's the way it works. All right. With that, we'll go ahead and get started. The first case is 23-10696, Oklahoma Firefighters v. Six Flags. And we'll begin with Rizzo Hamilton. Thank you so much. May it please the Court. My name is John Rizzo Hamilton, and I represent the lead plaintiff, Oklahoma Firefighters, and the proposed intervener, Key West Fire and Police. The District Court's decision should be reversed for two reasons. First, the District Court wrongly concluded that Oklahoma lacked Article 3 standing. And second, because even if Oklahoma did lack Article 3 standing, Key West should have been permitted to enter the litigation as a named plaintiff, either by way of amendment or intervention. And I'll begin with the first point on standing, because it is actually completely dispositive of everything before the Court today. The basis for the District Court's erroneous standing determination was its incorrect conclusion that this Court had previously held in its prior opinion in this case, that the entire truth about all of defendants' misstatements and omissions was fully revealed to the market. What is the biggest thing that was not admitted in October that was important to your client getting the stocks? So I think it was the fact that Riverside's financial condition was so dire that it was, in fact, completely incapable of making any meaningful progress whatsoever on the parks and completing them. And that is what was later revealed in January and February, and what was not revealed in the October disclosure, Your Honor. And, you know, there are many, many facts in the complaint that establish how material that information was. For instance, on January 10th, 2020, after the October disclosure that the District Court found had completely cured the market, defendants disclosed that Riverside had defaulted, and that as a consequence, the very existence of the parks was in jeopardy. And then in February 20th, 2020, defendants further disclosed that Riverside couldn't cure its default, and that as a result, the projects were abandoned entirely. It is one thing to say, as the company said in October of 2019, that the timeline is likely to slip somewhat. It is completely another thing to say that our partner that we're relying on to construct these facilities is incapable of it, and the projects must be abandoned entirely. This information is qualitatively different than what was disclosed earlier in October, and the market reaction to this information confirms that it was new and highly material and caused losses that were compensable under the securities laws. When had the market fully adjusted? As of February 20th, 2020, close of trading. The February announcement was made pre-market on the 20th, and that day, once trading opened, the stock price declined 16 percent, and that was the ultimate adjustment in the stock price. And significantly, this Court, in multiple prior decisions, has in fact emphasized that securities fraud claims may be brought on the theory that there was a series of partial disclosures that caused the stock price deflation at the end of that period. When you say we've done that multiple times, is the lead authority the Lombard case? The Lorman case, Your Honor, is what I would say is the lead authority. Lorman, I'm sorry. Lorman case, yes, Your Honor. Does that authority say full and final? Is that really the magic language? There can be a partial trickling of disclosures, but we're looking for the quote full and final? What the case says, and the language that I typically focus on for this purpose is that the claims may be pleaded on the theory, and I'm quoting here, that the truth, he uses the word pleaded on the theory, is that there was a series of partial disclosures, and that an entire series of disclosures caused the stock price deflation. And that's at pages 260 to 261. It was the same concept in Amedesis five years later, Your Honor. Is that, in your view, something the jury has to take a look at? So when a class period ends, that is, when the full truth is completely revealed, and the market has had an adequate amount of time to fully ingest the bad news into the stock price, is typically a question of fact. And it is one that is resolved in securities fraud cases across the country through the use of detailed fact and expert evidence. Typically, the kind of evidence that one has to see here— Did we identify any fraudulent statement after October of 2019? The last fraudulent statement that the Court identified occurred in July, but two points on that, Your Honor. I mean, therefore, it looks like their inference was, well, that is the very last one, and whether we use language of tempered versus corrected versus disclosed, at that point there was no more fraud. Impliedly, there was disclosure, and the market knew. So that's not correct, because it conflates two distinct concepts. And the Court recognized this, and, Norman, I'll get to it in a minute, but the concepts are, when the defendant makes the last false statement is not the same as when the class period ends. The class period ends at a later point in time, because the class period end date occurs only when the truth has been fully disclosed, and the market has had time to ingest that into the stock price. Now— All those lies were not corrected except for a little piece in October. That's exactly right. Before your client bought the stock. That's exactly correct. The lies had stopped by the time they bought the stock, but they had not been corrected fully until February. And Lorman is a great example of this on the language and the facts. So if you—page 265 of Lorman, this Court stated that, loss causation may be pleaded by alleging the defendant's omitted material facts in their public statements, which falsely inflated the stock values, just as we allege here, and that the subsequent—and that's Lorman's terminology—the subsequent public relation of the truth, concealed or in fact declined, and plaintiff's consequent economic loss. That's precisely what we're alleging here, and precisely what we're saying on this appeal. What if—what if they'd said, you know, we can't open any of the parks in China? And they just—they don't say, because we don't have the money, the construction has stopped. So if they— Wouldn't—wouldn't the corollary of we can't open them be any of the flaws that have been misstated before? So if they had said in October, we can't open the parks, we're calling them off, basically, I agree. Like, we'd probably have no case, okay? But— That's not if you buy the stock afterwards. Yeah, you sort of take it with that. And I guarantee you, if they had said that, by the way, in October, the stock price would have collapsed way more than it did. There is—so again, the stock price collapsed an additional 18 percent in January, an additional 16 percent— What I'm saying is there's a difference between, well, it'll take a little longer to, well, forget China. Right. Those two things are completely different in kind. In kind, and also the economic value of them is completely different. And in fact— I guess what's demonstrated by what you said in January. Yeah, and when you look at the analyst reaction, and I really want to make sure I go through this because it's really important. These are highly sophisticated securities analysts who have no dog in this fight whatsoever, whose job is to follow this company and report on it. This is what they said after the January disclosure, okay? So they already know for months now what's been disclosed in October. Wedbush downgraded the stock, affirmatively changed their view on the stock, and wrote, management continued to tell anybody that would listen until very recently that incremental projects in China were likely. They further wrote, 2020 was expected to mark the next step in the evolution of Six Flags' international strategy. If all the information, all the truth had been disclosed in October, Wedbush would not have written that and thought that. And then in February, we see additional similar analyst reaction from the firm Janny, which wrote, quote, we didn't think it could get worse, but it just did. And we also see William Blair writing, the second shoe finally dropped. So we're seeing new material information be disclosed in January and February. We're seeing the stock price crater as a result of that, and we're seeing analysts issue these statements, all of which demonstrates that the full truth had not been revealed in October. Let me ask you, I want to ask about the intervention. I realize we don't get to that if we end up agreeing with you all on this, but challenge all assumptions, so let's turn to the intervention. It seems to me that it was the district court that appointed you all as the lead plaintiff. Does that make a difference in analyzing, well, what about these other folks that are in the putative class? So it does, and I think the difference favors us, because we were appointed lead plaintiff, that is Oklahoma Firefighters, under the PSLRA of 1995, which is a statute that empowers the lead plaintiff to act for the class as a whole. And, you know, ever since that statute has been passed, one of the things that the lead plaintiff has done and that courts have the authority to do, and it's supposed to do because it's acting as a fiduciary duty for the class, is to propose additional class representatives if and when it's standing is ever called into question, or if and when it's trading is called into question, not on the basis of standing, but on the basis of adequacy or typicality under Rule 23 at the class certification stage. And so lead plaintiffs do this routinely. That was the reason you wanted Key West. Right. We thought that... And there's no question there's still a putative class. Correct. So there's... The judge never threw it out, just threw out the whole case. The judge, right, never denied... Class, okay. That's right, never denied class certification. And, you know, this Court's decision in Silva v. Val, from 1980, I believe, it tells us exactly what the district court was supposed to do here. In Silva v. Val, there were multiple named plaintiffs. It was a putative class action, had not yet been certified, and the district court hadn't even held a class certification hearing yet. And due to a change in a statute, all of the named plaintiffs lost their standing. And the district court nevertheless proceeded on to the merits to decide the merits, and defendants appealed to this Court, and this Court said the district court erred in going on to the merits when there were serious questions about the named plaintiffs' standing and what it should have done, and this Court specifically remanded with this instruction. What it should have done is allowed for intervention of named plaintiffs who, inarguably, had standing. And what we submit is that if the district court had concerns about Oklahoma firefighters' standing, we don't think those concerns are valid, but if it had them, the proper course under Silva v. Val was to allow intervention by a named plaintiff that had, A, affirmatively stepped forward into what was then very much a live litigation, and B . . . Let me ask you . . . Yes, Your Honor. I was not on the prior panel. What specific date do you contend that the fraud had been fully revealed by Six Flags? When did the class period end? The class period terminates February 20, 2020, with the premarket announcement that the project had been abandoned. And I would say, you know, this Court has previously recognized that that precise kind of disclosure can serve as a corrective disclosure in a securities fraud case. In the Spitzberg case, it was the abandonment of an oil well that closed the class period, and this Court very specifically held that the abandonment of that project sufficed to plead loss causation for the purposes of a Section 10b claim. Moving back to Your Honor's question about intervention, you know, we had a situation here where the District Court had concerns about standing, regardless of whether we disagree with those concerns. The proper course under Silva v. Bell was to allow a named plaintiff to intervene. In fact, a putative class member affirmatively came forward in the litigation seeking to do just that prior to dismissal, and way before the deadline for class certification to be filed. And who unquestionably had standing, because they purchased stock from as far back as June or July of 2018, very early in the class period. And he nevertheless denied their intervention. And I think the principal basis on which he denied it was that Summit Office Park, this Court's decision in that case in 1981, somehow precludes it. But that's absolutely not what Summit Office Park says. In Summit Office Park, this Court was faced with a situation where the original plaintiff lost standing because the Supreme Court decision said that plaintiffs of that type can't even sue under that particular statute. So what that plaintiff tried to do was, by way of amendment, substitute in an entirely new class that consisted of plaintiffs in common with the original class. Bring an entirely new claim on their behalf that had never been asserted in the previous litigation. And change the name plaintiff. And the Court was crystal clear that these were the essential bases of its decision on page 1282 of the case. It says, we hold only that where a plaintiff never had standing to assert a claim against the defendants, it doesn't have standing to amend the complaint by substituting new plaintiffs, a new class, and a new cause of action. That's not at all what we were trying to do here. Key West came in to assert the exact same cause of action on behalf of the exact same class that had been asserted in the original complaint. And furthermore, regardless of any dispute over whether this Court's decision robbed Oklahoma of standing, Oklahoma unquestionably had standing at the outset of the case. And that is when the Court decided to go through with the case. I see a few seconds left. Unless there are any other questions, I will conclude and save the balance of my time. Okay. Thank you. You saved time for rebuttal. Thank you very much, Your Honor. All right. Now we'll hear from Jay Kassner on behalf of Six Flags. Good morning, Your Honors. Jay Kassner for the Defendant's Appellees in support of affirming Judge Pittman's decision filed June 2nd. If it please the Court, I would propose to refer to Your Honor's opinion in the first appeal as Oklahoma 1, just for shorthand, because contrary, perhaps, to my friend representing the plaintiff that lacks standing here, this is not a motion for re-argument, this is not an en banc, and it actually has all of the earmarks of deja vu. When the parties were before Your Honors on Oklahoma 1, my friend Mr. Rizzo, Hamilton, told Your Honors, at 40 seconds into the argument, the statements at the heart of this case concerned Six Flags' timetables for opening three large-scale theme parks, as well as statements asserting that Six Flags was making construction progress in accordance with those stated timetables, period, close quote. At the argument, at four and a half minutes into the videotape, again, Mr. Rizzo, Hamilton made the following comment to Your Honors, as well as Judge Southwick, Judge Wiener, we acknowledge you were not part of the party at that time, but he said, quote, because the principal statements at issue here are that the parks were going to open on these stated timetables, and the construction was being made in accordance with those timetables, such that they were going to be achieved. Right, but in October, they didn't say, we aren't going to make them, they said it's going to be a little late. They didn't say that they're not making it, that it's not in progress, they just said it's going to be a little late. That's a little different, isn't it, than saying, nah, not going to do it. Your Honor, the answer with respect is no, and this argument precisely was made to the panel of this Court last year. Your Honors had the benefit of all of this argument. There was a briefing on this where the argument was made that after October of 2019, there were still false and misleading statements that were being made in January. There were full disclosure in February. Your Honors heard all of that, and what Your Honors did in the face of the Chief Executive Officer of Six Flags having said, and this appears at the Record on Appeal, pages 722, quote, I would say right now there's a very high likelihood going forward that we will see changes in the timing of park openings. He then went on and said, I just think it's unrealistic to think it's going to be exactly as we've outlined only because we know that these are part of much bigger developments and are likely to shift. In the face of that statement, a panel of this Court concluded, looking at all of the statements throughout the entirety of this period of time that we're discussing, the world changed in October. A panel of this Court previously concluded, having heard every argument that Mr. Rizzio made, having heard the representations of counsel— Your argument really is a law of the case. It is we have decided this issue factually. Absolutely, Your Honors, and the time to have— Instead of the oral argument, where it's the attorney's representations to the Court, where in the opinion is it this is all over, this is concluded? Your Honors, if you look, and I have the reporter version in front of me, Your Honors, it's 58F2, well, it's throughout, but the key passage is headnote 44 on page 218, and what Your Honors said in that opinion is you had gone through and Lormond is cited in the opinion. Your Honors had the benefit of Lormond. Your Honors had the benefit of the argument that there were additional nondisclosures in January, and Your Honors concluded, looking at all of the statements and what was alleged in the complaint on a motion to dismiss, that certain statements were actionable, but what Your Honors wrote at headnote 44 is as follows. By late 2019, however, defendant's language had changed. According to the complaint, during the October 2019 earnings call, quote, defendant Barber—and Mr. Barber was the chief financial officer of Six Flags—denied that there was any material change in the timeline of China over the last 90 days, but as this Court noted, in the full exchange on that call, defendant Reed Anderson, who was the chief executive officer, admitted there was, quote, a very high likelihood, et cetera, the language that I just read to the Court. The Court focused on the exact language that was said with the benefit of all of this argument— And why did we not conclude that Oklahoma lacked standing? Because it's our duty to look at that kind of thing regardless of the situation, regardless of you all raising it. If we lack jurisdiction right now, we've got to throw this out. Judge Haynes, certainly the Court had the ability to do so sua sponte. That was not an issue that was presented to the Court by any of the parties. Of course, it couldn't have been at the time. We didn't know how you were going to rule. It's sort of akin to the argument that is being made now as well— But you also didn't say the class ends in October. But you wouldn't have— Wasn't that relevant to the case? Your Honor, the effect—if I may, Judge Haynes, just if I could put for the benefit of the Court what the holding of the first case was, which is the next— Well, I'm aware of it, but go ahead. Okay, Your Honor, but I think it's important into context because you're being asked essentially to ignore the mandate of a prior panel of this Court to reconsider a prior decision, which is way untimely, to permit a party with no standing who went out and got an intervener. There's no coincidence here, Your Honor, and there's none disputed in the record, that After your Honors had ruled, quote, we hold that the statements before October of 19 satisfy the pleading standards, but because defendants had adequately tempered their optimistic language by October, the later allegations, meaning October and January and February, do not. They don't. They don't— No, it was allegations of new lies, not allegations of fixing the lie. No, no, no, Your Honor, it's the exact same thing that counsel is urging here, exactly. This is based on the pleadings, Your Honor. The pleadings didn't change. I understand that, but I'm curious because it's one thing to tell a new lie and another thing not to fix an old one. With all respect— There was a whole community of lies, and so that's their argument. I mean, so what is your answer to that? Well, Your Honors, consider the effect of what are alleged to have been false and misleading statements, and as you are permitted to do by the rules applicable to motions in this area, you look at the exact language of what the senior officers had said to the public, and Your Honors, the three of you, in Judge Southwick's opinion, concluded that that statement, quote, adequately tempered. Now, adequately tempered has to mean something. We believe the reason that you concluded, and what the evidence is that you concluded that the fraud, quote, unquote, ended at that point, is look at what else this court did once that conclusion was reached. Your Honors will recall, and no doubt are familiar from all of the law in this area that's made in this courthouse, scienter is a critical component in these cases. Your Honors, after concluding on page 218, after concluding that the statements October forward were non-actionable, you looked at scienter, but you didn't look at scienter with respect to the claims for October, January, or February. The inference for that is inescapable. The reason that you didn't look is you didn't have to, because you had concluded as a panel of this court that the language of Mr. Reed Anderson, the chief executive officer, had, quote, adequately tempered the prior statements. There was no fraud anymore. Whether Your Honors now, with all respect, the time to have come and said, whoa, wait a minute, does it turn on that, had adequately tempered the prior statements, or adequately tempered future expectations? Judge Higginson, in the opinion at 218, the language is, quote, had adequately tempered their optimistic language, meaning the optimistic language historically. So do you, just so I understand, you do accept Lorman, and you do accept there's a distinction between a first correction, if there were a series, and a full and final revealing the mistakes? No question. You do accept the distinction. No question. You're just saying here the market was fully informed and corrected as of October 2019? I'm not saying that. Or you're saying we said that? Your Honors, with respect, I believe this panel said that. And again— Then what about the response to the arguments just made that, in fact, we can tell the correction wasn't happening until the next year? Your Honors, the Supreme Court in the Dura case, Justice Breyer, has had an answer to that, as has the court in the SAIC case, which we cite in our papers. That case, just for a moment, because it bears on a question that Judge Haynes had asked, there is an argument being made by my friend on the other side that this court did not say that the original class period would continue. And similar to Your Honors' question, in the SAIC case, which is in our papers, the District Court dismissed a complaint in this area completely. The case then went up on appeal to the Second Circuit. The Second Circuit concluded that one of the two misstatements that the District Court had dismissed was actionable. The other was not. The mandate issued, consistent with the holding and the mandate of that court, the District Court said, well, then the class period has shortened because of the statements by the court that some of these disclosures were actionable, some are not. In the course of that decision, the plaintiff representing the investors there, as here, argued, well, wait a minute, the stock price dropped, similar to Judge Haynes' question, the stock price dropped here in January or in February. That has to be due to something. What the District Court in the SAIC case, in the Southern District of New York, and what Judge Breyer, in the Dura Pharmaceuticals case from the Supreme Court, both recognized stocks drop based on the announcement of negative information that doesn't necessarily mean that a fraud has been committed. For example, in this case, Your Honors concluded — Isn't that more factual? It's not, Your Honor, because counsel is speculating to the court that the reason for the January and the February stock drop was causative because of things that the company had said. This court has already — There were some more things in January and February. That was pretty huge, and what he quoted was pretty huge. Does that not matter? It doesn't matter, Your Honor. This court — In what case do we have — I very much appreciate the Second Circuit, but I'm not bound by it — what case do we have that says, well, heck, you made this one sentence, you're done, get out of here? Your Honors, this case stands for that — Subsequent — the law of the case, I'm sorry. This case stands for that proposition. This is the law that was made in this case on this record, on this complaint. The allegations adequately tempered — that has to mean something, Your Honors, because this court distinguished between the prior statements and the subsequent statements. Otherwise, you are not honoring what that, with respect, what that opinion says we don't believe. Mind? Let me ask you this, because you're starting to get down in time. I see. On the intervention — Yes, ma'am. So let's assume, arguendo, that we agree with all the stuff you've just said over the last 15 minutes. Then why wouldn't we let Key West in the door, because it's a putative class. They clearly bought the stock before October. And I'm not talking about amending the petition by the party that lacks standing. I'm talking about intervention by the party that has it. Why not? Yeah, Your Honor, that would run counter to well-settled law in this circuit. As we lay out in our brief, the law is clear that in this circuit, a plaintiff that lacks standing cannot seek to amend his complaint or her complaint — No, I'm not talking about amending the complaint. — or intervene. Key West himself is trying to come in. Key West wants to come in. I would commend the court to this court's decision in Krim, which is cited in our papers. In Krim — Krim is a very similar case to this one — and Judge Haynes, you asked counsel about the significance of lead plaintiff status. That was squarely addressed by this panel, and with respect to what my friend Mr. Rizzio Hamilton told the court is inconsistent with what this panel has done — well, this court has done in the Krim case. In Krim, which was a securities class action similar to this one, the court concluded that the plaintiffs, the lead plaintiffs who had been appointed, lacked standing. The reason for that had to do with whether or not they had purchased shares in a public offering which was unique to the claims that were being asserted in that case. Someone else came along and wanted to intervene who satisfied standing, and if I may, just to — yeah. In that case, because it's important that I be — Judge Higginbotham, writing for the panel, said as follows — and it is significant, Your Honor, that in this case, no motion for class certification has yet been made. There are cases from this court where the panels have made exceptions to the intervention rule where a class is either certified or a motion to certify has been made. That's the Lynch v. Baxley case, for example, and the case that my friend Mr. Rizzio Hamilton brought to Your Honor's attention. Both of those, the class motions had been made. Here, none has been. In CRIM, Judge Higginbotham, writing in similar circumstance to what we have here, writes as follows. This is at 402 F. 2nd 502, quote, as a preliminary matter, we note that this is not a case, just like this one, where intervention is sought for the purpose of appealing the denial of class certification. Indeed, appellants have chosen in this appeal not to challenge that denial. Thus, the prerequisites of an intervention, that there be an existing suit within the court's jurisdiction, depends here on the individual claims, just like here. None of the individual claims remained viable on February 14, 2003, when the motion to intervene was filed, disposes of the attempt at intervention. Said simply, no case, no standing, no intervention. Now, Judge Haynes, Judge Higginson, Judge Weiner, if Key West wants to bring a lawsuit, they can bring their own lawsuit. What they cannot do, though, is piggyback on Oklahoma's claims, as to which they do not have standing, and seek to intervene. That is settled law in this circuit for many, many years. The Summit case is one, the Aetna case is another, and the Crim case by Judge Higginbotham in 2003, 2005, of recent vintage, is on all fours. I see I have 29 seconds. Oh, the one thing I would mention, please, in the context of the standing analysis, there are three cases on which we rely principally, that we think dictate the outcome here. Starting with the Supreme Court of Basic v. Levinson, then going to the First Circuit opinion in Summa IV, in which the circuit said, if—may I just finish with the two Okay, don't tell me what they are, just— Okay, the Summa IV case of the First Circuit, and then Chief Judge Saylor's decision in the City of Bristol Pension Fund v. Vertex out of the District of Massachusetts. Thank you, Your Honors. I appreciate it. Thank you. All right, we'll hear the rebuttal. Thank you very much, Your Honor. So, a couple of points. Let me start with this law of the case concept, because the heart of their argument is that this court has already terminated the class period on October 23rd. That is not so. What the court was doing—first of all, the court never said that, never, not once. What the court was doing in the passage of the issue, and this is critical, the October 23rd disclosure was alleged to be both partially corrective, as well as a continuing misrepresentation. There was a statement by Defendant Barber where he said, we haven't seen any changes in the timeline in the last 90 days. We said that was false, and it was mixed in with a partial corrective disclosure, and the corrective disclosure period continued thereafter. That was always the last false statement in the case. We never alleged a false statement after that, and that's set forth in our complaint, okay? This court was merely holding that the alleged false statement on October 23rd was not actionable. It was not undertaking the fundamentally different and completely separate analysis of whether all the truth about all the misrepresentations had been adequately disclosed at that point. That's big picture point one. Big picture point two. My colleague said the whole case was always about timelines, and therefore, the timeline curation on the 23rd ends the whole case. That is also not so. From the beginning, this case has also been about statements concerning Riverside's financial condition, which indisputably were not cured in October. This court's own opinion held as much. And now here, I'm looking at page 24 of the original opinion. It's record page ending one, five, four, three. The court specifically examines false statements about Riverside's financial condition in 2019. And specifically concludes on page one, five, four, four. We conclude that the complaint alleges defendant's positive statements about Riverside contain actionable omissions about the company's true financial state. So those statements were very much a part of this case from the beginning, and very much a part of this court's original opinion. This court further concluded on page ending one, five, four, nine in the record. That there was scienter for those statements about Riverside's financial condition, and now I'm going to quote from the court, throughout 2019. So this court specifically held that there were false statements about Riverside's financial condition, and scienter for those false statements throughout 2019. Those false statements were not corrected until January and February of 2020, which is the point at which the class period ends. There's always a lag between the last actionable false statement and the full correction. That happened in Mormon. The last false statement was in May. The correction didn't occur until August. So we always see that. Is that, do you want to speak to his citation of SAIC in that? I very much do, your honor. Thank you so much, because SAIC stands for the same proposition that we are urging upon this court. In SAIC, the court specifically held that all curative information about the entire fraud had been revealed at a certain point in time, and that's why the class period ended. And in so holding, this is what the court wrote, and this is critical. Quote, in a securities class action, the class period should end when the market is cured. That is, when the full truth has been disclosed to the market. And the natural market forces have had a reasonable period of time to receive, digest, and reflect the bad news in the market price of the security. That's at page star four of the SDNY decision that they're relying so heavily on. This is an ignorant conceptual question, but I thought the sort of market efficient theory was it's corrected the minute. We assume the market corrects immediately upon the last miscorrection. Upon the very last- It's a flag notion. Oh, because sometimes courts have held that there could be like a two day trading window. Sometimes the information's very complex. Sometimes it's disclosed in kind of a murky half measure, and the market needs an extra day or two to fully absorb it. We do not allege that in this case. We allege the last disclosure was pre-market on the 20th, fully impounded by the end of the day. Two very other quick points, footnote two of this court's prior opinion specifically says that both parties assert the class period is from April 2018 through February 20th, 2020. If the court was going to change that, it probably would have said so. Last, CRIM. My colleague relied heavily on CRIM for the standing point, but that case is completely an opposite. In CRIM, and this was essential to the court's analysis, there had been a class certification motion and it was denied. And the parties did not appeal the denial of the class certification motion. So at the time intervention was denied and that was affirmed by this court, the case was no longer a putative class action. Unlike this one, where the putative class status of the action remains very much alive. Okay, thank you both sides. Nice to see you all again, and this case is now under submission.